UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
BANK OF AMERICA, NATIONAL ASSOCIATION,
successor in interest to Merrill Lynch
Bank & Trust Co., FSB and First Republic
Bank,

                         Plaintiff,

                - against -

WM. V. SCHMIDT CO., INC., MELVYN DOUGLAS
WEINTRAUB, and "JOHN DOE #1" THROUGH "JOHN
DOE #12", the last twelve names being
fictitious and unknown to Plaintiff, being
persons having or claiming an interest in
or lien upon the Collateral described in
the complaint,

                         Defendants.
----------------------------------------X

**MEMORANDUM AND
O R D E R**

10 Civ. 4926 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Bank of America, National Association ("Bank of America"), successor in interest to Merrill Lynch Bank & Trust Co., FSB ("Merrill Lynch") and First Republic Bank ("FRB"), brings this action against William V. Schmidt Co., Inc. ("Wm. V. Schmidt") and Melvyn Douglas Weintraub alleging breach of contract. Pending before the Court is plaintiff's motion for summary judgment on its contract claim and dismissing defendant's counterclaim. For the following reasons, plaintiff's motion is granted.

**FACTS**

1

The relevant facts are not in dispute. On April 8, 2008, Wm. V. Schmidt and FRB entered into a Business Loan Agreement.[1] Pursuant to the agreement Wm. V. Schmidt, a jewelry company, provided two promissory notes to FRB. The notes were exchanged for a $1,000,000 line of credit and a $1,000,000 term loan. The term loan obligated Wm. V. Schmidt to make monthly payments of principal and interest, with a final payment due March 31, 2012.[2] The line of credit required monthly payments of accrued interest and a payment of all outstanding principal plus any remaining accrued unpaid interest on the maturity date of January 31, 2009.[3] Under the Business Loan Agreement, a failure to make timely payments on either loan constituted an Event of Default. Other Events of Default included the "dissolution or termination of [Wm. V. Schmidt's] existence as a going business" or any "material adverse change" suffered by Wm. V. Schmidt. A consequence of any default was the acceleration of the entire outstanding indebtedness under both loans. Melvyn Douglas Weintraub, the President and a principal of Wm. V. Schmidt, personally guaranteed the loans pursuant to a commercial

---

[1] A copy of the Agreement is attached as exhibit A to the complaint.

[2] A copy of the note governing the term loan is attached as exhibit C to the complaint.

[3] A copy of the note governing the line of credit is attached as exhibit B to the complaint.

guaranty agreement.[4] The guaranty provided, among other things, that Weintraub would not dispose of or otherwise transfer all or substantially all of his assets without prior written consent of FRB. The parties also executed a commercial security agreement by which Wm. V. Schmidt offered "all personal property assets" as collateral.[5] Wm. V. Schmidt represented that it would not transfer or remove the collateral from its premises other than in the ordinary course of business. A default of this agreement also permitted FRB to accelerate the entire indebtedness owed by Wm. V. Schmidt.

Defendants claim that FRB, which was based in California, was eager to tap into the New York market and sought out Wm. V. Schmidt's business in an effort to access Melvyn Weintraub's business contacts. M. Weintraub Aff. ¶ 9. To support this assertion, they note that Weintraub brought Leonard Moscatelli, an agent of FRB who was integral to establishing the loan relationship, to the "exclusive Bull and Bear Club for the 24 Carat Club soiree where Moscatelli was introduced to many influential and well-to-do individuals." Id. ¶ 10. Defendants argue that both parties assumed that the loans were only the start of a "long-term relationship" and that, from their

---

[4] A copy of the commercial guaranty is attached as exhibit F to the complaint.

[5] A copy of the commercial security agreement is attached as exhibit D to the complaint.

perspective, the loans were similar to opening a bank account.[6] Id. ¶ 4, 14.

According to defendants, sometime "shortly after" the 24 Carat Club soiree on January 10, 2009, Moscatelli advised Weintraub "not to worry" about the January 31 maturity date of the line of credit because it would be extended. M. Weintraub Aff. ¶ 11. Whether in reliance of this statement or otherwise, it is undisputed that Wm. V. Schmidt did not pay the outstanding principal on the line of credit when it matured on January 31. However, defendants claim that despite the fact that they made "no principal payment...against the [line of credit] up to and including January 31," FRB "continued to accept the monthly payment of interest due." Defs.' Statement of Facts ("Defs.' SF") ¶ 21.

On July 14, 2009, over four months after the original maturity date, the parties entered into a modification agreement which extended the maturity date of the line of credit to September 30, 2009.[7] The modification agreement included an integration clause which stated:

> "This Agreement and other Loan Documents contain the entire agreement and understanding among the parties

---

[6] As addressed more fully below, defendants also claim that they were under the impression that there would be one loan for $2 million, and that it was not until the "last minute" that they discovered it would be split into two separate facilities. M. Weintraub Aff. ¶ 4.

[7] A copy of the modification agreement is attached as exhibit G to the complaint.

concerning the matters covered by this Agreement and other Loan Documents and supersede all prior and contemporaneous agreements, statements, understandings, terms, conditions, negotiations, representations and warranties, whether written or oral, made by the Lender or Borrower concerning the matters covered by this Agreement and other Loan Documents."

The modification agreement also included a provision which set forth that nothing in the agreement "shall be construed to obligate the Lender to extend the time for payment of the Note or otherwise modify any of the Loan Documents in any respect, except as expressly set forth in this Agreement," and a clause which established that the agreement may be modified "only by a written agreement signed by borrower and the lender." The agreement further acknowledged that the borrower carefully read all terms and conditions and entered into it voluntarily. Defendants point out, however, that the modification agreement obligated Wm. V. Schmidt to provide financial statements on a semi-annual basis. They believe this is noteworthy because there would be no reason to require such disclosures if the parties truly intended the loan to mature two and a half months after the modification.

On July 29, 2009, Weintraub signed a reaffirmation of guaranty in connection with the extension of the maturity date for the line of credit.[8] The reaffirmation stated that the borrower was not in default under the line of credit, despite

---

[8] A copy of the reaffirmation is attached as exhibit I to the complaint.

the fact that it had not been paid off by its original maturity date of January 31. It also obligated Weintraub to provide annual personal financial statements "no later than October 31st of each year," even though the maturity date for the underlying line of credit was September 30, 2009.

As the September 30, 2009 maturity date approached, Wm. V. Schmidt attempted to get the line of credit "in order." M. Weintraub Aff. ¶ 19. In an email dated August 27, Weintraub wrote to Stephen Szanto, a Managing Director at FRB, regarding an overdraft of Wm V. Schmidt's account. In this email, Weintraub informed Szanto that he was working on a mortgage application.[9] Ex. 8 to Defs.' SF. Szanto responded that FRB was "looking forward to getting [the overdraft problem] behind us and to receiving the HELOC application." Id. On September 24, less than a week before the maturity date, Szanto wrote another email to Wm. V. Schmidt in which he informed that he was "working on getting a 30-day maturity extension done to give you more time, but will need some updated financial information to support the request" and sought financial statements from the end of 2008 and June 2009. Ex. 9 to Defs.' SF. Richard Weintraub, Melvyn's son and the Vice President of Wm. V.

---

[9] The subject of the mortgage application, also referred to in emails between the parties as a "HELOC" (home equity line of credit), was Weintraub's New York cooperative apartment. Weintraub notes that the contemplated refinancing was in order to "assist in reorganizing the [line of credit]" and that the "cash-out from the cooperative refinance was part of our plan to get the [line of credit] in order." M. Weintraub Aff. ¶ 19.

Schmidt, responded that the statements and tax returns were being finished by the accountants and that FRB would receive them shortly.[10] Szanto merely replied, "ok." Id.

The September 30 maturity date passed without an extension or payment. Defendants claim that once again FRB continued to accept the monthly payment of interest despite the fact that no principal payment had been made. Defs.' SF ¶ 29. The record demonstrates that in the months that followed, FRB worked with Wm. V. Schmidt to resolve the loan situation before turning to litigation. On December 28, Szanto emailed the Weintraubs asking if it would be possible to meet sometime "this week" to "discuss the loan situation." Ex. 11 to Defs.' SF. A meeting was scheduled for January 4, 2010. While the outcome of that meeting is unknown to the Court, the record reflects that on February 1 Richard Weintraub wrote an email to Szanto in which he informed him that, while FRB was "expecting to speak with us this week," it would have to be delayed because of a family illness. Ex. 12 to Defs.' SF. Szanto responded with his sympathies and that he knew Richard would update FRB "when [he] can." Id.

Wm. V. Schmidt made its last payment on the term loan on February 28, 2010. On March 18, 2010, with both loans now in arrears, Szanto sent an email to the Weintraubs in which he

---

[10] It is unclear whether these documents were ever provided. Defendants do not assert or provide any evidence that they were, and thus plaintiff concludes that it "does not appear that the requested financials were supplied." Pl.'s Reply at 4 n.3.

thanked them for meeting with FRB that day and for "understanding our priority for righting this situation." Ex. 13 to Defs.' SF. Szanto set out the amounts due under each loan, and requested that Wm. V. Schmidt "make arrangements to bring the 2 loans current as soon as possible." He concluded that FRB "look[s] forward to hearing about your progress on the rest of the plan." Id. Lastly, on March 29 Richard Weintraub wrote an email in which he informed FRB of a meeting between Wm. V. Schmidt and another bank. Richard Weintraub stated that the other bank would be "more interested in taking on the whole $1.5 million instead of having [FRB] take a junior position." He added that "[o]nce we had told them how [FRB] was going to handle the balance of the $500K, they said that they could so (sic) the same thing. One may be a personal loan, the other a business loan." Ex. 14 to Defs.' SF.

The record does not reflect the outcome of either Wm. V. Schmidt's attempts to seek alternate financing or FRB's request that Wm. V. Schmidt correct the loan situation as soon as possible. However, we do know that Wm. V. Schmidt closed its business in June 2010. Ex. A to Schneider Decl. in Reply at 3 (Weintraub Deposition). On June 24, 2010 plaintiff brought this suit alleging a breach of contract. Prompted by Melvyn Weintraub's listing of his New York City apartment for sale and plaintiff's belief that Wm. V. Schmidt had improperly

transferred collateral, this Court signed an order to show cause as to why it should not issue an order (a) directing a seizure of the collateral, (b) scheduling a deposition of Melvyn Weintraub for purposes of determining the aggregate value and whereabouts of the collateral, and (c) preliminarily enjoining Weintraub from violating the term of his personal guaranty which prohibited him from selling or otherwise disposing of all or substantially of his assets without prior written consent. Order to Show Cause, June, 24, 2010, ECF 3.

On the return date of July 1, 2010, the defendant failed to appear and the requested order was signed. Specifically, Melvyn Weintraub was ordered to appear for a deposition. Defendants were enjoined from "removing, transferring, selling, pledging, assigning, or otherwise disposing of or permitting to become subject to a security interest or lien, the Collateral" pending its seizure.[11] Finally, Weintraub was preliminarily enjoined from selling or otherwise disposing of substantially all of his assets without plaintiff's written consent, including his apartment in New York City. Order, July 1, 2010, ECF 8.[12]

## PRIOR HISTORY

---

[11] The Court further ordered that upon plaintiff's properly-served letter application "attesting to the aggregate value of the Collateral and containing an undertaking of not less than twice the value of the Collateral and a proposed order, a seizure order will issue."

[12] The Court directed plaintiff to serve a copy of the Order by hand delivery and pre-paid overnight delivery by FedEx or similar service to Weintraub's New York apartment.

Following the entry of the preliminary injunction, plaintiff brought this motion for summary judgment on August 11, 2010. The motion was initially fully briefed by September 17 of that year. However, defendants' memorandum of law protested that the Court should not grant summary judgment in a case with "utterly no discovery" and requested that the Court order the depositions of Steven Szanto and Leonard Moscatelli.

Despite our expressed concerns over the timing of the request for discovery (pre-motion letters having been exchanged with no mention thereof), and our doubt about the value of any such depositions, we allowed defendants ten days to take the requested depositions, seven days beyond that for defendants to submit a supplemental memorandum, and five days for plaintiff to reply. Unfortunately, defendants' counsel failed to meet these deadlines or to timely update the Court as to its progress or need for an extension. Nonetheless, given our abiding concern that all litigants have a fair opportunity to present their positions, we allowed more time for defendants to take Moscatelli's deposition and to provide a memorandum of law. Plaintiff was also ordered to supply defendants with certain documents they had requested. Defendants ultimately submitted their supplemental materials on January 14, 2011, and plaintiff replied on February 7. The case was thus fully briefed, and this opinion followed.

**DISCUSSION**

A.   <u>Legal Standard and Defendants' Position</u>

In cases involving notes and guarantees, an "obligee establishes its prima facie case by demonstrating the execution of the obligation at issue, the underlying agreement, and defendant's failure to pay." <u>WestRM-West Risk Mkts. V. Lumbermens Mut. Cas. Co.</u>, 314 F. Supp. 2d 229, 232 (S.D.N.Y. 2004) (citing <u>Orix Credit Alliance, Inc. v. Bell Realty, Inc.</u>, No. 93 Civ. 4949 (LAP), 1995 U.S. Dist. LEXIS 12255 (S.D.N.Y. Aug. 23, 1995); <u>Valley Nat'l Bank v. Greenwich Ins. Co</u>, 254 F. Supp. 2d 448, 453 (S.D.N.Y. 2003)). The "party opposing summary judgment may defeat the motion only by asserting defenses that raise genuine issues of material fact." <u>Id.</u> (citing <u>Valley Nat'l Bank</u>, 254 F. Supp. 2d at 454).

In this case, defendants concede that FRB has established a prima facie case.[13] It is undisputed that there are two validly executed promissory notes governed by a single loan agreement, a validly executed guaranty, a validly executed modification agreement and reaffirmation of guaranty, and a failure to pay.

---

[13] In their opposition, defendants acknowledged that "provided Plaintiff, Bank of America, National Association...supplies the Court with proof it succeeded in interest to First Republic Bank...it appears Plaintiff has made out a prima facia [sic] case with respect to the sole cause of action it seeks Summary Judgement on." Defs.' Opp'n Mem. of Law at 1. Plaintiff provided such proof, having attached documentation that Merrill Lynch & Co., Inc., Merrill Lynch Bank & Trust Co., FSB, and FRB merged in 2007 and that Merrill Lynch Bank & Trust Co., FSB merged with Bank of America, National Association in 2009. Ex. C to Decl. of Spencer Schneider in Reply.

Thus, the only issue is whether defendants assert defenses raising a genuine issue of material fact.

Defendants do not articulate a specific contractual defense in any of their submissions. In their answer, they alleged that having not been "duly advised as to all the facts and circumstances surrounding the FRB Promissory Notes complained of," they are asserting the defenses of "accord and satisfaction, assumption of risk, negligence, duress, estoppel, failure of consideration, fraud, illegality, lender liability, payment, release, statute of frauds, statute of limitations, unclean hands, waiver, and any other matter constituting an avoidance or affirmative defense which further investigation of this matter may prove applicable herein." Answer ¶ 34. In their first memorandum of law opposing the motion for summary judgment, they argued that it will "become evident to the Court after a review of the affidavits of [the Weintraubs], the exhibits annexed thereto, [and] the Defendants' Counterstatement of Material Facts" that the "credit facility documents themselves," the "emails between FRB Managing Director, Stephen Szanto and Richard Weintraub," and the ""actions of the parties both prior to and after each of the purported due dates of the LOC of January 31, 2009 and September 30, 2009" support their position that "FRB's agents represented that the parties were going to be doing business 'for a long time' and that the

maturity date of the LOC was a mere formality and not expected to be enforced." Defs.' Opp'n Mem. of Law at 2. Finally, in their supplemental memorandum they put forth two arguments. First, that there was a "bait and switch" in which the defendants discovered "at the last minute" that the two million dollar loan they had agreed to was to be split into two separate entities, and second, that "FRB should not have been permitted to give Defendants financing." Defs.' Supplemental Mem. at 2, 6.

Thus, aside from reciting a laundry list of defenses asserted in their answer, defendants do not claim an actual legal defense in their memoranda.[14] Notably, defendants do not cite a single case, other than in setting forth the standard for summary judgment, in either their opposition or supplemental memoranda of law.

While defendants' various positions do not allow for easy appellation, it is clear that their various claims and "defenses" do not raise a genuine issue of material fact. Even granting defendants every reasonable inference, their arguments fail as a matter of law when applied to the undisputed facts.

B.  Potential Defenses

  1.  "Bait and Switch"

Defendants claim that they were surprised to find out at the "last minute" that the $2 million loan they would be

_____

[14] They do propose a specific form of relief, seeking reformation as the "only viable and equitable solution." Supplemental Mem. of Law at 10.

receiving from plaintiff was to be split into two loans, and that one was a line of credit with a maturity date just nine months later.[15] However, defendants concede that they were aware of this fact prior to closing on the loan. R. Weintraub Aff. ¶¶ 5, 7 ("we were told at the 'last minute' that the $2 million would be split into two (2) separate obligations" but "my father nevertheless signed the loan papers"); M. Weintraub Aff. ¶ 4 ("I was told at the 'last minute' that the $2 million would be split into two (2) separate obligations.")[16]

Since defendants clearly understood at the time of signing that the $2 million was to be split into two loans, any defense premised on an alleged "bait and switch" must fail as a matter of law.[17] Of course, this would almost certainly be the result even if defendants were not subjectively aware prior to signing

---

[15] Defendants do not state what type of loan they originally expected, other than that they expected one loan for $2 million. They also do not clearly explain why their ultimate failure to pay the debt was the result of the loan being split into two facilities.

[16] While it is immaterial whether Wm. V. Schmidt was made aware of the loan structure at the "last minute," we note that there is significant evidence contradicting this claim. FRB has produced a copy of the loan commitment letter it sent to Wm. V. Schmidt, dated January 17, 2008, which clearly lays out the terms of the two separate $1 million facilities. In response, defendants note that plaintiff has not located defendants' countersigned copy of the letter, which they believe evidences the fact that they never received it. However, plaintiff submitted a letter from Szanto to Weintraub dated January 23, 2008, in which Szanto wrote "[t]hanks for sending the commitment letter back so quickly" before requesting financial information in order to "get the underwriting going." Ex. B to Decl. of Spencer Schneider in Reply to Supplemental Mem. of Law. In addition, plaintiff provided a contemporaneous email from Szanto to Moscatelli, dated January 22, 2008, in which Szanto informed Moscatelli that the "[l]etter went by messenger today." Ex. C to Decl. of Spencer Schneider in Reply to Supplemental Mem. of Law.

[17] Defendants do not attempt to establish a defense of duress, and it would be unavailing if they did.

the agreement that the loan was to be split into two entities.
It is axiomatic that "in the absence of fraud or other wrongful
act on the part of another contracting party, a person 'who
signs or accepts a written contract...is conclusively presumed
to know its contents and to assent to them.'" <u>Gold v. Deutsch
Aktiengesellschaft</u>, 365 F.3d 144, 149 (2d Cir. 2004) (quoting
<u>Metzger v. Aetna Ins. Co.</u>, 227 N.Y. 411, 416 (1920); citing
<u>Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional de
Venezuela</u>, 991 F.2d 42, 46 (2d Cir. 1993); <u>Genesco v. T.
Kakiuchi & Co.</u>, 815 F.2d 840, 845 (2d Cir. 1987).

Defendants were fully aware of the structure of the loans
prior to signing the Business Loan Agreement. Thus, even if the
structure of the loan changed "at the last minute," this is not
a defense raising a genuine issue of fact.

   2.  <u>Defendants' Belief that this was a "Long-Term
       Relationship" and that the Maturity Date would be
       Extended</u>

Defendants aver that both parties assumed the loans were
the start of a "long-term relationship." Essentially, defendants
make two separate arguments. The first is that there was an
understanding between the parties that the maturity date was a
"mere formality" and that FRB did not expect payment. For this
contention, they rely primarily on the parties' course of
dealing and the contracts' financial disclosure requirements.
They note that FRB continued to accept payments of interest

after both the original and extended maturity date of the line of credit, and that the loans required Wm. V. Schmidt to provide financial statements well beyond those maturity dates.[18]  In addition, they argue that FRB wanted to be long-term business partners with Wm. V. Schmidt in order to access Melvyn Weintraub's business contacts. The second claim is that there is a triable issue of fact as to whether the parties agreed to an extension of the maturity date past September 24, 2009. For this assertion, they rely on the email correspondence between Szanto and Wm. V. Schmidt on September 24, 2009.

The first contention fails because the integration clause in the loan modification agreement, which extended the maturity date to September 30, necessarily defeats any claim that there was an understanding between the parties that the maturity date was only a formality and that FRB did not expect payment. It is "generally understood that the purpose of an integration clause 'is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or

---

[18] To review, the initial agreement governing the line of credit, signed in April 2008, required that Wm. V. Schmidt provide financial statements no later than five months after December 31. This is several months after the loan's initial maturity date of January 31.

The modification agreement, signed in July 2009 and extending the maturity date to September 30 of that year, also required financial statements five months from the end of the following calendar year.

In arguing that the parties intended this to be a long-term relationship, defendants also note that Wm. V. Schmidt signed a four and one-half year property lease on June 12, 2008. Weintraub claims this would not have occurred had Wm. V. Schmidt believed that the loan would mature on January 31, 2009. M. Weintraub Aff. ¶ 7.

contradict the terms of the writing."[19] Dujardin v. Liberty Media Corp., 359 F. Supp. 2d 337, 356 (S.D.N.Y. 2005) (quoting Primex Int'l Corp. v. Wal-Mart Stores, Inc., 89 N.Y.2d 594, 600 (1997)). Thus, the "integration clause prohibits the court from considering any oral contract that was allegedly made prior to the written agreement, since parol evidence to vary, contradict, or supplement the terms of a fully integrated agreement is not admissible." Holloway v. King, 161 Fed. Appx. 122, 124-25 (2d Cir. 2005) (citing Primex, 89 N.Y.2d at 600). To the extent that defendants argue that there was a pre-existing agreement between the parties that the maturity date of September 30, 2009 was merely a formality, the parol evidence rule simply precludes this from being a material issue of fact.[20]

---

[19] While the contract contains a choice-of-law provision stating that California law should govern, plaintiff's memoranda primarily use New York law. Defendants, who do not cite case law from any state or circuit in their memoranda, do not object to plaintiff's use of New York law. While we focus on New York law in this decision, it is inconsequential as plaintiff points out that California courts adhere to the parol evidence rule as well. Payless, Inc. v. Mariners Mile Gateway, LLC, 111 Cal. Rptr. 3d 173, 181 (Cal. Ct. App. 2010) (noting extrinsic evidence cannot be used to vary or contradict an integrated contract's express terms and cannot be used to contradict a non-integrated contract's terms unless the language is "reasonably susceptible" to the proposed interpretation).

[20] In addition, defendants' promises to submit financial disclosures after the maturity dates do not mean that the lender necessarily intended to continue to fund the loan after maturity. This conclusion is prohibited by the clause that nothing in the modification agreement "shall be construed to obligate the Lender to extend the time for payment...or otherwise modify any of the Loan Documents in any respect, except as expressly set forth in this Agreement."

Even without that provision, this argument essentially asks the Court to hold that the presence of an obligation to provide financial statements after the clearly defined maturity date is a superior manifestation of the parties' contractual intent than the clearly defined date. Obviously, this premise is absurd.

Likewise, defendants' argument that the parties agreed to extend the maturity date past September 30 does not raise a triable issue of fact. The modification agreement extending the maturity date to September 30 contained a provision which stated that it could only be modified by a written agreement signed by both parties. Defendants' purported written agreement is the email from Szanto in which he informed Wm. V. Schmidt that he was "working" to secure a thirty day extension. Even if the entire email correspondence on that date were a sufficient "signed writing," no reasonable trier of fact could find that it evinces an agreement to extend the maturity date of the loan. Szanto's email simply stated that he was "working on getting a 30-day maturity extension done to give you more time, but will need some updated financial information to support the request" before asking that the Weintraubs provide financial statements and tax returns from 2008 as well as interim statements as of June 30, 2009, if available. Ex. 9 to Defs.' SF. In response, Richard Weintraub wrote that the statements are "currently being finished by the accountants and you will have them as soon as we get them," and Szanto replied, "ok." Id. As noted above, defendants do not provide any evidence or assertion that they ever submitted such documentation, and FRB concludes that it appears they did not. Ultimately, the record does not contain a triable issue of fact as to whether the parties validly extended

the maturity date of the loan.[21] Thus, it is clear as a matter of law that Wm. V. Schmidt was in default of the line of credit upon failing to pay off the principal by September 30, 2009.[22]

Lastly, the fact that FRB did not immediately sue Wm. V. Schmidt upon default but rather continued to collect interest payments and meet with the Weintraubs in an effort to resolve the situation does not raise a genuine issue of fact. While a contractual breach may be waived by the non-breaching party, the New York Court of Appeals has held that the waiver of a contractual right requires a "voluntary abandonment or relinquishment." Beth Isr. Med. Ctr. V. Horizon Blue Cross & Blue Shield of N.J., 448 F.3d 573, 584-85 (2d Cir. 2006) (quoting Jefpaul Garage Corp. v. Presbyterian Hosp., 61 N.Y.2d 442, 446 (1984)). Waiver "must be proved to be intentional," and thus the defense of waiver requires a "'clear manifestation of an intent by plaintiff to relinquish her known right' and 'mere silence, oversight or thoughtlessness in failing to object' to a breach of contract will not support a finding of waiver." Id. at

---

[21] Inasmuch as defendants are claiming that they relied on Szanto's representation, this defense also must fail. There is absolutely no allegation or evidence that Wm. V. Schmidt would have paid off the loan if not for Szanto's email.

[22] We briefly note that that any assertion that the maturity date was a "mere formality" is belied by the undisputed facts that Wm. V. Schmidt was "working" to get the line of credit "in order" and that FRB was "working on an extension" but needed financial documents from Wm. V. Schmidt. Obviously, the parties were well aware of the existence of the maturity date and the need for a formal extension. The fact that no formal extension came to fruition does not mean that it was not necessary to obtain one.

585 (quoting <u>Courtney-Clarke v. Rizzoli Intern. Publications, Inc.</u>, 676 N.Y.S.2d 529, 529 (N.Y. App. Div. 1st Dep't 1998)).

Since the intent of the parties is crucial to a determination of waiver, it is often a question of fact for the jury. <u>Id.</u> In this case, however, it cannot seriously be argued that FRB waived its right to collect the money owed. While FRB did not bring a lawsuit immediately upon default and perhaps even collected interest payments, the record demonstrates that FRB consistently asserted its right to the money and repeatedly requested that Wm. V. Schmidt make arrangements to resolve the situation. Thus, inasmuch as defendants' factual submissions to the court imply that they are asserting a defense premised on waiver, it is rejected.

Ultimately, Wm. V. Schmidt agreed to pay outstanding principal on a line of credit by September 30, 2009, and Melvyn Weintraub guaranteed this debt. Regardless of whether defendants, and even plaintiff, believed that this was a mere formality and that the maturity date would be extended, defendants are obligated to honor their contract. Carried to its logical conclusion, defendants' position is that they had no meaningful obligation to repay the money that they borrowed. Obviously, that is not a position we can endorse. Thus, defendants, who concede that there is a prima facie case of a breach of contract, have not successfully asserted a defense

raising a triable issue of fact arising out of their belief that the loan was the beginning of a "long-term relationship."[23]

### 3.  Wm. V. Schmidt's Credit-Worthiness

In their supplemental memorandum of law, defendants argue that FRB knew that Wm. V. Schmidt was not a good candidate for the debt instruments it received and that the lender "pushed the loans through to satisfy their [sic] own agenda, which now may appear to have been to eventually reach Weintraub's realty in New York City and in Bridgehampton." Supplemental Mem. of Law at 6. Defendants rely on deposition testimony and email correspondence amongst FRB employees to argue that FRB did not believe the jewelry business was a safe industry, that FRB was aware that Wm. V. Schmidt was a "weak" candidate for a loan, and that FRB relied primarily on the strength of Weintraub's guaranty, which was secured by his personal assets which included two residential properties. They claim that FRB did not even review the bank statements of Wm. V. Schmidt. Id. at 6-10. They argue that Wm. V. Schmidt, which did not have a lawyer

---

[23] Defendants do not assert a defense of fraudulent inducement or any other reliance-based defense claiming that they were wrongfully misled into agreeing to the loan and guaranty as a result of its belief that it would be a long-term relationship. Such a claim would be utterly baseless. New York law requires a party to prove "misrepresentation and reliance on the misrepresented fact in order to establish that a contract was fraudulently induced." Cular v. Metropolitan Life Ins. Co., 961 F. Supp. 550, 555 (S.D.N.Y. 1997). Defendants do not allege that anyone at FRB made a misrepresentation which induced them to sign the contract. In fact, they argue just the opposite: that Szanto and Moscatelli believed the same thing about the loan as defendants, and that the contract is now being enforced in a way never intended by the parties.

review the documents, was "flying blind into an impossible situation." Id. at 3.

Aside from a fleeting reference to "predatory-type lending practices," it is unclear what defense is being asserted that defendants believe raises a triable issue of fact. As with all of their arguments, defendants do not articulate a specific defense or cite to a single case which supports their claim. In this instance, however, it is clear that there is no support for defendants' argument. It is preposterous to suggest that a loan made to a sophisticated commercial entity should be reformed even if the lender relied primarily on the strength of a guaranty and collateral supporting the loan. As plaintiff points out, statutes prohibiting predatory lending are tailored to situations involving consumer home loans secured by a mortgage. Pl.'s Mem. of Law in Reply to Supplemental at 7.

In any event, the emails and other evidence which defendants rely on to assert this "defense" provide no factual support. Far from revealing a nefarious plot, the emails submitted to the Court reflect a thoughtful and meticulous analysis on the part of FRB as to whether Wm. V. Schmidt was a viable loan candidate. While employees at FRB expressed significant reservations about making this loan, they ultimately decided that the strength of Weintraub's guaranty and assets made the risk worthwhile. These are entirely legitimate, indeed

commendable, business practices. Ex. 18 to Defs.' Supplemental Mem. of Law.

C.   Other Events of Default and Acceleration of Indebtedness

As plaintiff points out, not only is Wm. V. Schmidt in default for failure to pay the line of credit by the maturity date, but it is also in default as a result of its failure to make timely payments on the term loan, the material adverse change it suffered by going out of business, and because it transferred collateral without FRB's consent. Any of these defaults accelerate the entire indebtedness, and thus FRB would be entitled to judgment on the amount due under the line of credit even if there was no separate default under that note. Thus, even if we determined that reformation of the line of credit was appropriate, plaintiff would still be entitled to summary judgment.

D.   Damages

Lastly, the parties dispute the amount of damages. Plaintiffs claim that defendants owe $1,689,807.68, whereas defendants argue the correct number is $1,273,140.92. A review of the outstanding bill submitted to the Court by defendants clearly reflects the two loan instruments as well as the amount of principal, accumulated interest, and penalties owed on each of the facilities. Having analyzed the document, there is no

material issue of fact as to the amount owed, which is
$1,689,807.68.

## CONCLUSION

For the aforementioned reasons, plaintiff's motion for
summary judgment on its contract claim and to dismiss
defendant's counterclaim is granted. Having found that the loans
are enforceable and that defendants are in breach of the loan
agreement, it logically follows that plaintiff is entitled to
the relief sought under counts two and three of the complaint as
well. Accordingly, plaintiffs should submit a judgment on notice
in accordance with this opinion. If defendants wish to raise any
issues related to the guaranty or the security agreement (i.e.
the apartment or the stones), they should do so in the context
of the entry of the judgment.

**SO ORDERED.**

Dated:     New York, New York
           March 25, 2011

                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE


Copies of the foregoing Order have been mailed on this date
to the following:


Spencer Lee Schenider
70 Lafayette Street
New York, NY 10013

24

Michael F. Mongelli, II
41-07 162nd Street
Flushing, NY 11358